RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0256p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

MICHAEL D. JOHNSON, MATTHEW COLLARO, JOHN M. BERG, MALLIKARJUN B. KANDULA, and TYLER L. SEAMONS, individually and as representatives of a class of participants and beneficiaries on behalf of Parker Retirement Savings Plan,

　　　　　　　　　*Plaintiffs-Appellants*,

　　　　*v.*

PARKER-HANNIFIN CORPORATION, BOARD OF DIRECTORS FOR PARKER-HANNIFIN CORPORATION, HUMAN RESOURCES AND THE COMPENSATION COMMITTEE OF THE BOARD OF DIRECTORS FOR PARKER-HANNIFIN CORPORATION, and PARKER TOTAL REWARDS ADMINISTRATION COMMITTEE,

　　　　　　　　　*Defendants-Appellees*.

　　　　　　　No. 24-3014

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:21-cv-00256—Bridget Meehan Brennan, District Judge.

Argued:  July 24, 2024

Decided and Filed:  November 20, 2024

Before:  MOORE, MURPHY, and BLOOMEKATZ, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Sean E. Soyars, SCHLICHTER, BOGARD LLP, St. Louis, Missouri, for Appellants.  Michael E. Kenneally, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C., for Appellees.  **ON BRIEF:**  Sean E. Soyars, SCHLICHTER, BOGARD LLP, St. Louis, Missouri, for Appellants.  Michael E. Kenneally, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C., Christopher J. Boran, Kevin F. Gaffney, MORGAN, LEWIS & BOCKIUS LLP, Chicago, Illinois, Keri L. Engelman, Joshua Adler, MORGAN, LEWIS & BOCKIUS LLP, Boston, Massachusetts, for Appellees.

　　　MOORE, J., delivered the opinion of the court in which BLOOMEKATZ, J., joined. MURPHY, J. (pp. 23–46), delivered a separate dissenting opinion.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  Five of the approximately 32,000 current and former Parker-Hannifin Corporation employees who participate in the Parker Retirement Savings Plan brought this action against the Parker-Hannifin Corporation and related boards, committees, and board members, alleging that Parker-Hannifin violated the Employee Retirement Income Security Act of 1974 ("ERISA").  Specifically, the plaintiffs allege that Parker-Hannifin breached its fiduciary duties by imprudently retaining the Northern Trust Focus Funds, imprudently providing participants with higher-cost shares, and failing to monitor its agents in their fiduciary duties.  The district court dismissed plaintiffs' claims.  For the following reasons, we **REVERSE** the district court's judgment and **REMAND** for further proceedings consistent with this opinion.

## I.  BACKGROUND[1]

### A.  Factual Background

Plaintiffs-Appellants Michael D. Johnson, Matthew W. Collaro, John M. Berg, Mallikarjun B. Kandula, and Tyler L. Seamons (collectively, "Johnson" or "Plaintiffs") are five of the approximately 32,000 current and former Parker-Hannifin Corporation employees who are participants in the Parker Retirement Savings Plan ("Plan").  R. 20 (Am. Compl. ¶ 14, 16–20) (Page ID #538–40).  They bring their claims individually and as representatives of a class of Plan participants and beneficiaries.  *Id.* ¶ 1 (Page ID #534).  The Plan is a defined contribution employee pension benefit plan, *id.* ¶ 11 (Page ID #538), governed by ERISA, 29 U.S.C. § 1002.  Defendant-Appellees (collectively, "Parker-Hannifin") are the Plan's fiduciaries and are collectively responsible for the administration of the Plan.  R. 20 (Am. Compl. ¶ 21–30) (Page ID #540–43).

---

[1]We present the facts by accepting the complaint's well-pleaded factual allegations as true and interpreting them in the light most favorable to the plaintiff. *Reilly v. Vadlamudi*, 680 F.3d 617, 622 (6th Cir. 2012).

With approximately $4.3 billion in assets, the Plan is among the largest 0.03% of all defined contribution plans in the United States. *Id.* ¶ 14–15 (Page ID #538). "Defined contribution plans dominate the retirement plan scene today." *Id.* ¶ 39 (Page ID #546–47) (quoting *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008)). In defined contribution plans, "the employees and retirees bear all investment risks." *Id.* ¶ 40 (Page ID #547). Plan administrators create a menu of investment options for plan participants—the employees and retirees—and the participants then select investments from this menu of options. *Id.* ¶ 41 (Page ID #547); *Johnson v. Parker-Hannifin Corp.*, No. 1:21-cv-00256, 2023 WL 8374525, at *1 (N.D. Ohio Dec. 4, 2023). The ultimate amount of retirement money available to participants depends on the success of those investments. *See Johnson*, 2023 WL 8374525, at *1.

## 1. Northern Trust Focus Funds

One of the investment options chosen by Parker-Hannifin was the Northern Trust Focus Funds ("Focus Funds"). R. 20 (Am. Compl. ¶ 4) (Page ID #535). The Focus Funds are a suite of target date funds that "were collective investment trusts, not mutual funds, comprised primarily of index or passive strategies." *Id.* ¶ 63 (Page ID #556). Target date funds are "a single diversified investment vehicle . . . offered as a suite of funds typically identified by the participant's target retirement date." *Id.* ¶ 45 (Page ID #549). When a target date fund is passively managed, "the portfolio manager is attempting to mimic the performance of a relevant benchmark return." *Id.* ¶ 51 (Page ID #551). This relevant benchmark is often a market index. *Id.*

Target date funds typically "rebalance their portfolios to become more conservative as the participant gets closer to retirement." *Id.* ¶ 47 (Page ID #549). In other words, it is a plan that gradually shifts a retirement fund's investments from riskier to safer options as you get closer to retirement age. This reallocation is based on the Fund's "glide path." *Id.* "A glide path determines how the fund's target asset allocations . . . are expected to change over time . . . as the target retirement date approaches." *Id.* "[T]he development of a target date fund's glide path and the corresponding underlying asset allocation are the most essential components of a target date fund." *Id.* ¶ 50 (Page ID #550). A "diversion[]" from a target date fund's "determined glide

path," or a significant change in the target date fund's "underlying assets or asset allocations can have an extremely negative impact on wealth aggregation of" participants. *Id.* ¶ 52 (Page ID #551). Glide paths in retirement funds come in two main types: "to" and "through." "To" glide paths reach their most conservative allocation at the target retirement date and stay there, while "through" glide paths continue to adjust and become more conservative for several years after the retirement date. The Focus Funds were a "through" target date fund. *Id.* ¶ 71 (Page ID #560).

The Focus Funds were launched in 2009. *Id.* ¶ 63 (Page ID #555). The Focus Funds were advertised as "back-tested," meaning that qualitative models were used to create a hypothetical performance history to demonstrate how the Funds *would have* performed under past conditions, had they previously existed. *Id.* ¶ 65 (Page ID #556–57). Back-tested data is purely hypothetical and "not reliable because it can be easily manipulated by the investment manager to show inflated investment results and is based on the benefit of hindsight." *Id.*

From the time the Focus Funds launched until 2013, the Funds underperformed the S&P target date fund benchmark, an "industry-accepted target date benchmark for 'Through' target date funds used by investment professionals." *Id.* ¶ 67–68 (Page ID #557).

In addition to underperforming industry standards, the Focus Funds also faced high turnover rates. Turnover rates measure how often a fund changes its investments, with higher rates meaning the fund frequently buys and sells stocks or bonds. In 2013, the Focus Funds "changed 5 out of the 10 index funds in which [it] invest[ed], resulting in significant and material changes to the underlying assets and allocations of those assets." *Id.* ¶ 79 (Page ID #563). The Focus Funds turnover rates reached as high as 90 percent. *Id.* ¶ 80 (Page ID #564). This "substantial turnover" created transaction costs for the Funds. *Id.* A turnover rate above 30% "warrants close analysis by investment professionals as it can suggest that the manager is not following a disciplined investment strategy." *Id.* ¶ 81 (Page ID #564) (internal quotation marks omitted).

Effective February 1, 2014, Parker-Hannifin replaced the existing retirement investment options, called Fidelity Freedom Funds, with these new Focus Funds. *Id.* ¶ 82–83 (Page ID #564–65). In so doing, all the money that employees had in the old funds was moved into these new Focus Funds. *Id.* The Plan assets moved to the Focus Funds constituted approximately $800 million of Plan participants' retirement savings. *Id.*

From 2014 on, the Focus Funds continued to "substantially underperform" the S&P target date fund benchmark as well as other target date funds. *See id.* ¶ 86–93 (Page ID #566–69). "[D]espite the persistent underperformance and upheaval in" the Focus Funds, *id.* ¶ 95 (Page ID #569), the Funds remained in the Plan until September 2019, *id.* ¶ 94 (Page ID #569).

### 2. Fees

In addition to choosing the investment options available to plan participants, plan fiduciaries "also have control over the expenses charged to participants." R. 20 (Am. Compl. ¶ 42) (Page ID #548). Different investment alternatives chosen by the Plan's fiduciaries have different fees. *Id.* Investment fees are charges associated with managing and operating the funds in a retirement plan. Because "a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement," fiduciary decisions affecting fees can "dramatically affect the amount of money that participants are able to save for retirement." *Id.* ¶ 43 (Page ID #548).

Several funds included in the Plan offered institutional investors, like Parker-Hannifin, different share classes with different costs. *See, e.g.*, *id.* ¶ 105–106 (Page ID #573–74). "The different share classes of a given mutual fund or collective trust have the identical manager, are managed identically, invest in the same portfolio of securities, and allocate their assets the same. The only differences are the fees charged." *Id.* ¶ 100 (Page ID #571–72).

From 2015 to 2019, Parker-Hannifin invested in the Focus Funds' K share class, which had a 0.07% fee. *Id.* ¶ 105 (Page ID #573). During that time, however, there was a J share class "with a substantially lower fee of 0.02%" available. *Id.* "The .05% fee difference between the Focus Funds' K and J shares was the only distinction between the two shares." *Johnson*, 2023 WL 8374525, at *4 (citing R. 20 (Am. Compl. ¶ 100, 105) (Page ID #571–74)).

Parker-Hannifin's "failure to utilize the available, lower-cost share class of the Focus Funds caused the Plan to pay as much as 250% more in fees." R. 20 (Am. Compl. ¶ 105) (Page ID #573–74).

Likewise, Parker-Hannifin invested in Vanguard Funds' share classes with fees ranging between 0.01% and 0.03% higher than Vanguard's lower-cost share classes. *See id.* ¶ 106–07 (Page ID #574). "Fund providers explicitly acknowledge the ability of plan fiduciaries to negotiate for lower-cost shares." *Id.* ¶ 103 (Page ID #573). Vanguard, for example, "recognizes this ability and expressly reserves the right to establish higher or lower minimum amounts for certain investors." *Id.* (internal quotation marks omitted).

"The marketplace for retirement plan investment options, including target date funds, is established and competitive." *Id.* ¶ 2 (Page ID #535). Given the Plan's $4.3 billion in assets, it "had tremendous bargaining power to obtain share classes with far lower costs"; "[l]ower-cost share classes of the Plan's investments were readily available." *Id.* ¶ 102 (Page ID #572). To the extent that the Plan's assets did not meet "advertised minimum investment thresholds for the lowest-cost institutional shares, the investment provider would have waived those requirements based on the Plan's size, if the Defendants had requested such a waiver." *Id.* "By providing Plan participants the more expensive share classes of Plan investment options, [Parker-Hannifin] caused participants to lose millions of dollars of their retirement savings." *Id.* ¶ 108 (Page ID #575).

## B. Procedural History

Johnson filed suit on January 29, 2021, R. 1 (Compl.) (Page ID #1), and filed a first amended complaint on June 11, 2021, R. 20 (Am. Compl.) (Page ID #534). Asserted under ERISA, 29 U.S.C. § 1132(a)(3), the complaint alleges that Parker-Hannifin breached its fiduciary duties, *see id.* § 1104(a), when it (1) imprudently retained the Northern Trust Focus Funds, (2) failed to negotiate for access to share classes with reasonable investment management fees, and (3) failed to monitor its agents in exercising their fiduciary duties, *see* R. 20 (Am. Compl. ¶ 114–36) (Page ID #582–87).

Following several motions and notices of supplemental authority, *see Johnson*, 2023 WL 8374525, at *4, Parker-Hannifin moved to dismiss the Amended Complaint, R. 45 (Renewed Mot. to Dismiss) (Page ID #1218). The district court granted Parker-Hannifin's motion to dismiss. *Johnson*, 2023 WL 8374525, at *1.

As to Johnson's claim that Parker-Hannifin breached its duty of prudence when it retained the Focus Funds, the district court found that Johnson did not state a viable claim of breach of fiduciary duty because he did not identify other plans that could serve as meaningful benchmarks, *id.* at *6, the other supporting evidence was untimely, *id.* at *8, and, even if not untimely, "high turnover rates" and "limited or no performance history" are not sufficient to sustain an imprudence claim, *id.* at *9. As to Johnson's second claim—that Parker-Hannifin breached its duty of prudence by obtaining higher-cost shares, the district court found that Johnson's "lone allegation that the investment thresholds would have been waived upon request is speculative and conclusory," and thus insufficient to state a claim. *Id.* at *11. Finally, because "Count Three's fate is contingent on the success or failure of Counts One and Two," and because the district court "granted Defendants' motion [to dismiss] as it relates to Counts One and Two," it also dismissed Count Three. *Id.* at *12. This appeal followed. *See* R. 55 (Notice of Appeal) (Page ID #1640).

## II. ANALYSIS

### A. Standard of Review

"We review de novo a district court's decision to grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Peterson v. Johnson*, 87 F.4th 833, 836 (6th Cir. 2023). To defeat a motion to dismiss, a plaintiff must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). If a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," then the claim is facially plausible. *Id.* In determining whether a complaint is facially plausible, "we construe the . . . complaint liberally, in plaintiff's favor,

accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Logsdon v. Hains*, 492 F.3d 334, 340 (6th Cir. 2007).

## B.  ERISA Duty of Prudence

"ERISA protects participants in employee benefit plans, including retirement plans, by establishing standards of conduct for plan fiduciaries." *Forman v. TriHealth, Inc.*, 40 F.4th 443, 447 (6th Cir. 2022).  One such standard of conduct is the duty of prudence.  Under ERISA, a fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B).  "[T]he duties charged to an ERISA fiduciary," including the duty of prudence, "are 'the highest known to the law.'"  *Chao v. Hall Holding Co.*, 285 F.3d 415, 426 (6th Cir. 2002) (quoting *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996)).

An ERISA fiduciary's duty of prudence is derived from the law of trusts and "requires plan administrators to select initial investment options with care, to monitor plan investments, and to remove imprudent ones," *Forman*, 40 F.4th at 448 (citing *Tibble v. Edison Int'l*, 575 U.S. 523, 528–29 (2015) (hereinafter *Tibble I*)).  A plan participant may, accordingly, bring a breach of fiduciary duty claim under ERISA if a plan fiduciary imprudently selects an investment option or "fail[s] to properly monitor investments and remove imprudent ones."  *Tibble I*, 575 U.S. at 530.

The duty of prudence is a process-driven obligation.  *See Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022) (calling the duty of prudence "largely a process-based inquiry"); *Pfeil v. State St. Bank & Tr. Co.*, 806 F.3d 377, 384 (6th Cir. 2015) (calling it a "prudent-process standard"); *see also Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 482–83 (8th Cir. 2020).  When we enforce the duty of prudence, we focus on the fiduciary's "real-time decision-making process, not on whether any one investment performed well in hindsight."  *Forman*, 40 F.4th at 448; *see also* Restatement (Third) of Trusts § 77 cmt. a (2007). For an imprudent-retention claim, we ask whether the fiduciary, at the time it chose to retain an investment, "employed the appropriate methods to investigate the merits of the investment." *Pfeil*, 806 F.3d at 384 (quoting *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 723 (6th Cir. 2000)).

The ultimate question is whether the fiduciary engaged in a reasoned decision-making process when it decided to retain the investment. *Id.*; *see also Davis*, 960 F.3d at 482 ("This statutory duty of prudence establishes 'an objective standard' that focuses on 'the process by which' decisions are made, 'rather than the results of those decisions.'" (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009))); *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014).

## C. Imprudent Retention of Funds

Johnson's first claim is that Parker-Hannifin "failed to properly monitor and remove the imprudent Northern Trust Focus Funds." Appellant Br. at 24. Johnson points to three defects that would prompt a prudent fiduciary to remove the Focus Funds. *See id.* at 24–26. First, Johnson argues that a prudent fiduciary would not have selected, and then would have removed, the Focus Funds based on the Focus Funds' short and untested track record. *Id.* at 25. According to Johnson, a prudent fiduciary would not select a fund without "a sufficient live (not hypothetical or back-tested) performance record to assess whether the manager has proven an ability to generate superior long-term performance," and then would not retain that fund "despite continuing underperformance." *Id.* at 24, 26. Second, Johnson argues that a prudent fiduciary would "monitor changes in strategy or asset holdings," and "monitor a fund's turnover ratio and understand that excessive turnover can mean that the manager is attempting to remedy underperformance by deviating from the fund's strategy, warranting further scrutiny." *Id.* at 25. Because the Focus Funds had "major changes in asset holdings, extremely high turnover,"—as high as a 90% turnover rate—"and substantial transaction costs," a prudent fiduciary would have removed the Funds. *Id.* at 9; R. 20 (Am. Compl. ¶ 79–81) (Page ID #563–64); *see also id.* ¶ 95 (Page ID #569–70) (alleging "persistent . . . upheaval in those funds"). Finally, Johnson argues that a prudent fiduciary would have removed the Focus Funds based on its underperformance compared to the S&P target date fund benchmark and alternative target date funds. Appellant Br. at 26, 33.

Parker-Hannifin, for its part, argues that Plaintiffs "allege no facts about the Plan fiduciaries' process," instead simply pointing to funds with better performance; ERISA plan participants, however, "cannot 'simply point[] to a fund with better performance' to state a

claim." Appellee Br. at 25 (alteration in original) (quoting *CommonSpirit*, 37 F.4th at 1166). Parker-Hannifin, moreover, argues that the S&P target date fund benchmark and alternative funds that Johnson points to are not meaningful benchmarks. *See id.* at 27–36. Finally, Parker-Hannifin argues that, "[e]ven if an insufficient performance history or excessive turnover could somehow raise concerns about the initial selection of the Focus Funds back in 2013," that selection occurred outside ERISA's six-year statute of repose, and Johnson has "not alleged anything within the six-year leadup to this case that made it imprudent to retain the funds." *Id.* at 38.

We first consider the relevant statutory period. Under ERISA, "[n]o action may be commenced . . . with respect to a fiduciary's breach of any responsibility, duty, or obligation . . . after . . . six years after . . . the date of the last action which constituted a part of the breach or violation." 29 U.S.C. § 1113(1)(A). January 29, 2015 marks six years prior to the filing of this lawsuit. *Cf.* R. 1 (Compl.) (Page ID #1).

As noted above, an ERISA fiduciary has an obligation not only to select prudent investments, but also to remove imprudent ones. "This continuing duty exists separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments at the outset." *Tibble I*, 575 U.S. at 529. The Supreme Court explained that: "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. In such a case, so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely." *Id.* at 530.

Johnson's first piece of evidence of imprudence is the Focus Funds' back-tested, hypothetical data and lack of "live performance history." R. 20 (Am. Compl. ¶ 65) (Page ID #556–57). Johnson alleges that, at the time Parker-Hannifin selected the Focus Funds, it was imprudent to select a fund without live performance data. *See* Appellant Br. at 24–26. Johnson does not, however, allege that the Focus Funds remained untested and without sufficient live performance data after Parker-Hannifin selected it and on an ongoing basis. Though it may have been imprudent to *select* the Focus Funds without live performance data, Johnson does not allege that it was imprudent to *retain* the Focus Funds after January 29, 2015—or at any point—on the basis of a lack of live performance data. Because Johnson claims only that it was imprudent to

retain the Focus Funds, the lack of live performance history at the time of selection does not support the claim.

Johnson's second and third pieces of evidence—the Focus Funds' high turnover rates and underperformance—however, both implicate Parker-Hannifin's choice to retain the Focus Funds after January 29, 2015. The Focus Funds had turnover rates as high as 90 percent, R. 20 (Am. Compl. ¶ 79–80) (Page ID #563–64), causing "persistent . . . upheaval in" the Funds, *id.* ¶ 95 (Page ID #569). A turnover rate measures how much of a fund's assets have been replaced over the course of a year. That "upheaval" and the significant transaction costs caused by high turnover rates directly implicate the fiduciary's ongoing decision to retain the Focus Funds, both before and after January 2015. *Id.* ¶ 79–80, 95 (Page ID #563–64, 569). Likewise, the Focus Funds' alleged underperformance could impact Parker-Hannifin's prudence in nonetheless choosing to retain the funds, a choice that post-dated January 29, 2015.[2] *See, e.g.*, *id.* ¶ 90 (Page ID #568). Upheaval and underperformance both implicate Parker-Hannifin's decision to retain the Focus Funds during the relevant period.

Although the dissent argues that the complaint fails to state a claim for continued imprudent retention because it does not allege ongoing turnover in the period after Parker-Hannifin added the Focus Funds to the Plan, Dissenting Op. at 40–41, this is not the full story. First, the complaint specifically alleges a high rate of turnover prior to 2014, but it also makes clear that the administrators were imprudent in light of the "significant changes" in the Funds' recent history, R. 20 (Am. Compl. ¶ 79) (Page ID #563–64), "*coupled with* the [Funds'] persistent underperformance," *id.* ¶ 87 (Page ID #567) (emphasis added). Johnson does not rely only on an allegation that past turnover *on its own* would compel a prudent administrator to replace the Focus Funds, but rather asserts that turnover (even historical turnover) would, when combined with the rest of the Funds' flaws, compel an administrator acting pursuant to a prudent process to replace the Funds. A plaintiff need not plead that each challenged administrative

---

[2]As we explain below, the precise timing of the turnover or underperformance does not matter where a prudent administrator would consider it as part of a later retention decision. The dissent suggests that Parker-Hannifin had to wait for a "change in circumstances" in order to replace the Focus Funds. Dissenting Op. at 40. But an administrator has a "continuing duty" to "'systematically consider all the investments of the trust at regular intervals' to ensure that they are appropriate." *Tibble I*, 575 U.S. at 529 (cleaned up) (quoting Bogert, *Law of Trusts and Trustees* § 684 (3d ed. 2009)).

choice *on its own* constitutes a breach of fiduciary duty. *See Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 469 (6th Cir. 2011) ("[T]he court's job is not to scrutinize each allegation [in a complaint] in isolation but to assess all the allegations holistically." (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 326 (2007))).

Second, though the relevant period for this lawsuit begins in January 2015, a diligent investment professional's ongoing review of an investment's performance would not necessarily be so limited. A jury could find that, in 2015, a prudent administrative process weighing the retention of a fund would take into account any underperformance and turnover, even if it occurred before the fund was added to the Plan in 2014. Indeed, Johnson alleges that "diligent investment professionals assess a fund's prior performance based on a three-year trailing performance," which in early 2015 would have included 2013, the year when Johnson alleges the Funds underwent 50% turnover. R. 20 (Am. Compl. ¶ 55, 79) (Page ID #552, 563). It would also have included the period when, according to the complaint, the Focus Funds underperformed the S&P target date fund benchmark. *Id.* ¶ 69 (Page ID #558–59). What matters is whether a prudent administrative process would find the Funds' history of turnover significant in its assessment of the investments' ongoing inclusion in the Plan in 2015. As discussed in more detail below, Johnson's assertions make such an inference reasonable and it is for the jury to pass judgment on whether Parker-Hannifin's fiduciary duties *in fact* required it to replace the Focus Funds in early 2015 based on the combined effect of underperformance and turnover, whether historical or not.

The next question is whether Johnson's allegations of high turnover rate and underperformance, taken together, sufficiently state a claim for imprudence under ERISA. In *Smith v. CommonSpirit Health*, plaintiffs alleged that their pension administrator acted imprudently under ERISA when it selected the Fidelity Freedom Funds, a suite of target date funds, as an option for its participants. 37 F.4th at 1164–66. To make that claim, the *CommonSpirit* plaintiffs "mainly compare[d] the Fidelity Freedom Funds' performance to [another fund's] performance for a five-year period, noting that the Freedom Funds trailed the" other fund by a significant amount each year. *Id.* at 1166. We held that "pointing to a fund with better performance" "may offer a building block for a claim of imprudence," but it does not

alone suffice to demonstrate imprudence. *Id.* at 1166–67. Instead, a plaintiff who points to a higher-performing fund must also provide "evidence that an investment was imprudent from the moment the administrator selected it, that the investment became imprudent over time, or that the investment was otherwise clearly unsuitable for the goals of the fund based on ongoing performance." *Id.* at 1166.

That a plaintiff is permitted to point to a higher-performing fund—in conjunction with additional context-specific evidence—to demonstrate imprudence, does not mean that a plaintiff is required to point to a higher-performing fund to demonstrate imprudence. In fact, *CommonSpirit* itself noted that a meaningful benchmark "*may* offer a building block" and "will *often* be necessary," not that it is always necessary in order to state a claim. *Id.* at 1166, 1167 (emphasis added). Likewise, in *Forman v. TriHealth, Inc.*, we noted that "the 'meaningful benchmark' hurdle may be" "[i]mportant" in some circumstances, but less-so in others. 40 F.4th at 451.

This makes sense. Under ERISA, prudence is a "process-driven dut[y]." *CommonSpirit*, 37 F.4th at 1167; *see also Pfeil*, 806 F.3d at 384. Imprudence claims, moreover, must be viewed from a "foresight-over-hindsight perspective." *CommonSpirit*, 37 F.4th at 1167. "The focus is on each administrator's real-time decision-making process, not on whether any one investment performed well in hindsight." *Forman*, 40 F.4th at 448. Put differently, even if a poorly chosen fund happens to perform well, the administrator would still have acted imprudently. A plaintiff sufficiently states a claim of imprudence if it pleads facts sufficient to give rise to an inference of insufficient process. *See CommonSpirit*, 37 F.4th at 1165–66, 1168; *Forman*, 40 F.4th at 450–51. A meaningful benchmark may sometimes be one part of an imprudence pleading, but it is not required.

Though a meaningful benchmark is not required to plead a facially plausible claim of imprudence, Johnson does in fact plead a meaningful benchmark in this case. Johnson alleges that the Focus Funds were "comprised primarily of index or passive strategies." R. 20 (Am. Compl. ¶ 63) (Page ID #556). When a target date fund is passively managed, Johnson alleges, "the portfolio manager is attempting to mimic the performance of a relevant benchmark return" and models the fund based on the asset allocation of the indices. *Id.* ¶ 51 (Page ID #551).

Stated otherwise, Johnson makes the factual allegation that the Focus Funds were "designed to meet industry-recognized benchmarks." *Id.* ¶ 70 (Page ID #560). By definition, then, the Focus Funds share the same goals, strategies, and risks as the indices they are designed to replicate. *Cf. CommonSpirit*, 37 F.4th at 1167. Recognizing that the Focus Funds were expressly structured to meet an industry benchmark, Johnson alleges that the S&P target date fund benchmark was the relevant "industry-accepted target date benchmark[] for 'Through' target date funds used by investment professionals." R. 20 (Am. Compl. ¶ 67–68) (Page ID #557). Johnson alleges that the Focus Funds underperformed the S&P target date fund benchmark through at least 2014, *id.* ¶ 86–87 (Page ID #566–67), and that a prudent fiduciary would have thus removed the Focus Funds by the end of January 2015, *id.* ¶ 91, 95–96 (Page ID #568–70); *see also* Appellant Br. at 10.[3]

In *Braden v. Wal-Mart Stores*, plaintiffs alleged that plan fiduciaries "did not change the [investment] options included in the Plan despite the fact that most of them underperformed the market indices they were designed to track." 588 F.3d at 596. The court held that the market indices provided a meaningful comparison because "tracking the market index was the stated investment goal of the fund the plaintiffs challenged." *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 281 (8th Cir. 2022) (citing *Braden*, 588 F.3d at 595–96).

Just as the challenged fund tracked a market index in *Braden*, the Focus Funds were "designed to meet industry-recognized benchmarks." R. 20 (Am. Compl. ¶ 70) (Page ID #560); *Braden*, 588 F.3d at 596. Because tracking an industry-recognized index is the "investment goal" of a passively managed target date fund such as the Focus Funds, a relevant market index is inherently a meaningful benchmark. *Matousek*, 51 F.4th at 281; *see also* R. 20 (Am. Compl. ¶ 51) (Page ID #551) (explaining that "the portfolio manager is attempting to mimic the performance of a relevant benchmark return"). Contrary to the dissent's assertion,

---

[3]This is different from *CommonSpirit*, in which we rejected the use of a passive fund as a benchmark for an active fund. 37 F.4th at 1166. For an active fund, a "portfolio manager actively makes investment decisions and initiates buying and selling of securities in an effort to maximize return." *Id.* at 1163 (quoting John Downes & Jordan Elliot Goodman, *Barron's Dictionary of Finance and Investment Terms* 9 (6th ed. 2003)). Evaluating performance of these funds is more complex, as the fund's strategy may differ significantly from that of an index or passive fund. *See id.* And because an active fund is not trying to mimic an index, managers have more flexibility to adjust asset allocation based on market conditions or their outlook. *See id.* Therefore, year-to-year comparisons between active funds and indices or passive funds can be more inconsistent.

Dissenting Op. at 23, we thus break no "new ground" by holding that Johnson sufficiently pleaded that the Focus Funds were "attempting to mimic" the S&P target date fund, making it a meaningful benchmark, R. 20 (Am. Compl. ¶ 51, 67–68) (Page ID #551, 557).

Parker-Hannifin argues that the S&P target date fund benchmark is not a meaningful comparison because (1) it "combines different aspects of all sorts of different target date funds [and thus] is not a meaningful benchmark for evaluating any *particular* target date fund," and (2) "Plaintiffs do not allege that the Focus Funds underperformed the S&P [target date fund benchmark] during the alleged class period." Appellee Br. at 35. Parker-Hannifin, however, fails to point to any circuit court that has held that a market index can never serve as a meaningful benchmark. *See id.* at 34–35. As noted, in *Braden*, our sibling circuit expressly held that market indices are appropriate meaningful points of comparison for passive funds. 588 F.3d at 595–96*.* Parker-Hannifin fails to show why this is incorrect and its argument about the timeframe is likewise unavailing. Johnson alleges that the 2014 underperformance data (which demonstrates underperformance through December 2014) would have alerted a prudent fiduciary to withdraw from the Focus Funds by early 2015. *See* R. 20 (Am. Compl. ¶ 91, 95–96) (Page ID #568–70); Appellant Br. at 10. Because the relevant period begins in January 2015, that allegation is timely.

The dissent argues that the complaint has failed to allege sufficient details about the S&P target date fund benchmark—i.e., its risk profile, bond-to-equity ratio, and investment strategy—and that this omission prevents the court from adequately comparing the Focus Funds' actual performance to the posited benchmark for purposes of assessing prudence. *See* Dissenting Op. at 37–38. But Northern Trust made this comparison all on its own when it designed the Funds, and a jury could find that this shortfall between what the Funds promised and what they delivered should have caused a prudent administrator to replace the Focus Funds. Surely, whether a product, financial or otherwise, delivers the results it promises is "meaningful." Even the dissent acknowledges this truth. Dissenting Op. at 34 ("[I]f a fund meets its own disclosed investment objectives, 'the fact that [it] is outperformed by many others will have little bearing in a court test of prudence.'" (citation omitted)). But here, the Focus Funds did not meet their own disclosed investment objectives. Where a complaint alleges that a fund, by its design, sets a

benchmark for itself and repeatedly fails to meet that benchmark, it is perfectly appropriate to submit to a jury the prudence of the administrator's process in retaining the fund despite that failure.

Nor must the complaint specifically articulate that the Focus Funds were designed to match the S&P target date fund benchmark in particular. The appropriate inquiry is whether the complaint alleges enough facts to permit the reasonable inference that the S&P benchmark would allow a jury to assess appropriately the Funds' performance and the prudence of the process that led to their retention.[4] We hold that the complaint here does; the complaint alleges that the Focus Funds were "designed to meet industry-recognized benchmarks," R. 20 (Am. Compl. ¶ 70) (Page ID #560), that "[t]he S&P target date fund benchmark is one such benchmark," *id.* ¶ 68 (Page ID #557), and that the Funds systematically underperformed that benchmark, *id.* ¶ 70 (Page ID #560). Against this backdrop, it is certainly plausible that a prudent administrative process would find such performance unacceptable and would result in the Focus Funds' replacement. It is for the jury to decide whether the Funds' failure to meet the S&P benchmark in fact meant that a prudent administrative process would have resulted in their replacement.

In addition to pleading underperformance compared to the S&P target date fund benchmark, a meaningful comparison,[5] Johnson's allegations support reasonable inferences about the imprudence of Parker-Hannifin's administrative process. "Even when the alleged facts do not 'directly address[ ] the process by which the Plan was managed,' a claim alleging a breach of fiduciary duty may still survive a motion to dismiss if the court, based on circumstantial

---

[4]We find the dissent's seven-page long analysis of whether, *on the merits*, Johnson's underperformance allegations are sufficient to sustain an imprudence claim under ERISA to be entirely inappropriate at this stage of the litigation. *See* Dissenting Op. at 27–33. The question is whether, taken together, Johnson's allegations of underperformance and historical turnover make it plausible that a prudent administrative process would have led to the replacement of the Focus Funds. The dissent's lengthy exposition of the showing Johnson would have to make in order to prevail *at trial* (which *precedes* the dissent's discussion of the plausibility of the complaint's allegations) creates the mistaken impression that Johnson's complaint has failed to carry a huge evidentiary burden—one that is inapplicable to the matter currently before us.

[5]In addition to the S&P target date fund benchmark, Johnson points to three alternative target date funds as possible meaningful benchmarks. *See, e.g.*, Appellant Br. at 33. Because we hold that the S&P target date fund benchmark is a meaningful comparator, we need not determine whether the alternative target date funds are also meaningful benchmarks.

factual allegations, may reasonably 'infer from what is alleged that the process was flawed.'"[6] *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (quoting *Braden*, 588 F.3d at 596). This is because "[n]o matter how clever or diligent, ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences. . . . If plaintiffs cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants, the remedial scheme of the statute will fail, and the crucial rights secured by ERISA will suffer." *Braden*, 588 F.3d at 598.

"Plausibility requires the plaintiff to plead sufficient facts and law to allow 'the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *CommonSpirit*, 37 F.4th at 1165 (quoting *Iqbal*, 556 U.S. at 678). Accepting Johnson's allegations as true, as we must, Parker-Hannifin retained the Focus Funds despite "persistent" "upheaval" of the Funds' assets and turnover rates many times higher than what is considered "significant" and "warrant[ing] close analysis."[7] R. 20 (Am. Compl. ¶ 59, 95) (Page ID #554, 569–70). Johnson's objection to Parker-Hannifin's retention of a fund despite high historical turnover rates and persistent underperformance relative to the Funds' stated objectives suggests an objection to the process by which Parker-Hannifin decided to retain the Focus Funds for as long as it did. A jury could plausibly find that a prudent decision-making process would have considered the Funds' turnover and underperformance and would have arrived at the conclusion that retaining the funds would not be in the Plan's best interests.

---

[6]The dissent asserts that "[t]o plead a *process* problem using circumstantial factors, one might think the test should at least require plaintiffs to plead facts plausibly suggesting that the investment itself was what then-Judge Scalia called a 'patently unsound' investment." Dissenting Op. at 34 (quoting *Fink v. Nat'l Sav. & Tr. Co.*, 772 F.2d 951, 962 (D.C. Cir. 1985) (Scalia, J., concurring in part and dissenting in part)). But the law does not require this. Nor did then-Judge Scalia's opinion. That opinion posited that "careful investigation and evaluation" does not justify a "patently unsound" investment, not that a process claim requires pleading such an investment. *Fink*, 772 F.2d at 962 ("[T]here are two related but distinct duties imposed upon a trustee: to investigate and evaluate investments, and to invest prudently.").

[7]Johnson alleges that "[t]he average turnover for all of the funds in the Focus Fund series was 90 percent, which is astoundingly high for any investment strategy," much less a passively managed retirement fund, *id.* ¶ 80 (Page ID #564), and that any turnover greater than 30% is "significant" and "warrants close analysis," *id.* ¶ 59, 81 (Page ID #554, 564).

Furthermore, the factual allegation that Parker-Hannifin imprudently retained the Funds despite turnover and underperformance stems from a "foresight-over-hindsight perspective." *CommonSpirit*, 37 F.4th at 1167. The turnover rate was known at the time that Parker-Hannifin was making its allegedly imprudent retention decisions. These forward-looking factual allegations, accepted as true, give rise to an inference of deficient process in retaining the Focus Funds as an investment option. Taking these allegations together, Johnson has pleaded facts sufficient to state a claim for imprudent process.

**D. Imprudent Provision of Higher-Cost Shares**

Johnson next argues that Parker-Hannifin violated its duty of prudence when it wasted participants' money by providing higher-cost shares of Plan investment options when it could have secured lower fees for participants. *See* Appellant Br. at 38–42. Specifically, Johnson argues that Parker-Hannifin imprudently "invested in the K-class shares of the Focus Funds instead of the identical lower-cost J-class shares, and also invested in higher-cost shares of three Vanguard funds." *Id.* at 39 (citing R. 20 (Am. Compl. ¶ 105–07) (Page ID #573–74)). Parker-Hannifin, on the other hand, argues that because there is no "allegation that the Plan 'readily qualified' for those cheaper shares by satisfying their minimum-investment requirements," the district court properly dismissed this claim. Appellee Br. at 46.

In *Forman v. TriHealth, Inc.*, the plaintiffs claimed that their plan fiduciaries offered them "pricier retail shares of mutual funds when those same investment management companies offered less expensive institutional shares of the same funds to other retirement plans." 40 F.4th at 450. The *Forman* plaintiffs argued that it was imprudent not to "take advantage of—indeed just ask for—these lower-priced mutual fund shares for the same investment team and same investment strategy when [the] retirement plan has nearly half a billion dollars in assets." *Id.* We agreed. We held that "these allegations permit the reasonable inference that TriHealth failed to exploit the advantages of being a large retirement plan that could use scale to provide substantial benefits to its participants," and "[u]nder the common law of trusts, which supplied the backdrop to ERISA," that allegation sufficiently "state[s] a claim of imprudence." *Id.* Though we recognized that there were "[e]qually reasonable inferences in the other direction," that "could exonerate TriHealth once all of the facts come in," we held that, "at the pleading

stage, it is too early to make these judgment calls." *Id.* Because imprudence "is plausible, the Rules of Civil Procedure entitle" the plaintiffs "to pursue [their imprudence] claim . . . to the next stage." *Id.* (quoting *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 281 (6th Cir. 2010)).

Likewise, in *Davis v. Washington University in St. Louis*, ERISA plan fiduciaries offered more expensive retail shares for some funds, "even though minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans." 960 F.3d at 483. The Eighth Circuit permitted plaintiffs' claim of imprudence to move forward, explaining that:

> The complaint alleges that the marketplace for retirement plans is competitive, and with $3.8 billion invested, WashU's "pool of assets" is large. From these facts, two inferences of mismanagement are plausible from WashU's failure to offer more institutional shares. The first is that it failed to gain access to them because, as the complaint alleges, it did not negotiate aggressively enough with Vanguard. The second is that it was asleep at the wheel: it failed to pay close enough attention to available lower-cost alternatives. Either way, a "failure of effort [or] competence" is enough to state a claim for breach of the duty of prudence.

*Id.* (quoting *Braden*, 588 F.3d at 596).

"Wasting beneficiaries' money is imprudent." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (en banc) (hereinafter *Tibble II*) (citation omitted). "It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks." *Id.*; *see also* R. 20 (Am. Compl. ¶ 43) (Page ID #548) (detailing the effect of fees on a beneficiary's investments). Pursuant to trust law, "a trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble II*, 843 F.3d at 1198.

Like the participants in *Forman* and *Davis*, Johnson plausibly alleges that plan fiduciaries breached their duty of prudence by selecting a share class with a higher fee when reasonable effort would have unlocked a class with a lower fee. *See Forman*, 40 F.4th at 450–51; *Davis*, 960 F.3d at 483. Johnson alleges that "[t]he marketplace for retirement plan investment options, including target date funds, is established and competitive." R. 20 (Am. Compl. ¶ 2) (Page ID

#535).  With "over $4.3 billion in net assets and over 32,000 participants with account balances, . . . the Plan is among the largest 0.03% of all defined contribution plans in the United States." *Id.* ¶ 14–15 (Page ID #538).  Moreover, given the large asset size of the Plan, it "had tremendous bargaining power to obtain share classes with far lower costs," and "[l]ower-cost share classes of the Plan's investments were readily available."  *Id.* ¶ 102 (Page ID #572).  Johnson made factual allegations making it plausible that, to the extent that the Plan's assets did not meet "advertised minimum investment thresholds for the lowest-cost institutional shares, the investment provider would have waived those requirements based on the Plan's size, if the Defendants had requested such a waiver."[8]  *Id.*; *see also id.* ¶ 103 (Page ID #573) ("Fund providers explicitly acknowledge the ability of plan fiduciaries to negotiate for lower-cost shares."); *id.* ¶ 15 (Page ID #538–39) ("The Plan's massive size gives it enormous bargaining power to command outstanding investment products with . . . very low fees.").

These allegations closely mirror those in *Davis*.  960 F.3d at 483.  Moreover, they "permit the reasonable inference that [Parker-Hannifin] failed to exploit the advantages of being a large retirement plan that could use scale" to get lower-cost shares for its participants.  *Forman*, 40 F.4th at 450.  Perhaps, once more facts are developed, Parker-Hannifin will be able to demonstrate that lower-cost shares were not readily available.  At this stage, however, Johnson has sufficiently pleaded facts to make out a plausible claim that Parker-Hannifin either failed to "negotiate aggressively enough" or "failed to pay close enough attention to available lower-cost alternatives," and, "[e]ither way, a 'failure of effort [or] competence' is enough to state a claim for breach of the duty of prudence."  *Davis*, 960 F.3d at 483 (second alteration in original) (quoting *Braden*, 588 F.3d at 596).  "In the absence of discovery or some other explanation that would make an inference of imprudence implausible, we cannot dismiss the case."  *Forman*, 40 F.4th at 453.

---

[8]The dissent analogizes this allegation about investment providers' willingness to waive investment thresholds to a "mere[] legal conclusion[]" that is "conclusory and not entitled to be assumed true."  Dissenting Op. at 43 (citations omitted).  But this is a straightforward factual allegation about industry practice which the jury will be entitled to credit or discredit, but which we must accept as true at this stage.

Taken together, Johnson's factual allegations support the reasonable inference that it would be imprudent if Parker-Hannifin's administrative process failed to negotiate access to lower-fee share classes. Once discovery is exchanged and evidence presented, a jury could conceivably credit evidence that investment providers do not routinely waive minimum investment thresholds for large plans, that Parker-Hannifin did in fact ask for such lower-fee shares, or that it did not make such a request because it had good reasons for believing the answer would be no. But this possibility does not suffice to create, as the dissent suggests, an "*obvious* alternative explanation" that "Parker-Hannifin negotiated for the best fees that its investments permitted." Dissenting Op. at 46 (quoting *Iqbal*, 556 U.S. at 682) (emphasis added). Because Johnson alleges facts to support a reasonable contrary inference, the dissent posits a merely *possible* alternative explanation which is insufficient to require dismissal at this early stage. *Braden*, 588 F.3d at 596 ("Rule 8 does not require a plaintiff to plead facts tending to rebut all possible lawful explanations for a defendant's conduct.").

The dissent would apply an inappropriately exacting standard, requiring that Johnson "plausibly *establish*" that Parker-Hannifin imprudently failed to obtain lower fees. *See* Dissenting Op. at 41 (emphasis added). But Johnson need only plausibly *allege* facts supporting such an inference and need not *establish* anything at this stage. And the dissent posits that Johnson should have pleaded, among other things, the specific share classes in which the Plan invested *as well as* what other share classes were available, the minimum investment thresholds for the less expensive share classes, the Plan's precise investments relative to those thresholds, whether the investment providers granted waivers to *other* plans and why they did so. *Id.* at 43–44. We hold that this is evidence for the jury to consider and that Johnson need not plead it to clear Rule 8(a)'s bar. *See Braden*, 588 F.3d at 596.

## E. Failure to Monitor

Johnson's final claim is that Parker-Hannifin failed to monitor its agents who acted imprudently. Appellant Br. at 42. All parties agree that the failure-to-monitor claim is contingent on the survival of the other two claims. *See Johnson*, 2023 WL 8374525, at *12; Appellant Br. at 42; Appellee Br. at 51; *see also Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1158–59 (10th Cir. 2023) (explaining how failure to monitor claims "rise or fall" with

imprudence claims).  Because we reverse the district court's dismissal of Counts I and II, we also reverse the district court's dismissal of Count III, the failure-to-monitor claim.

### III.  CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's judgment and **REMAND** for further proceedings consistent with this opinion.

———————————

**DISSENT**

———————————

MURPHY, Circuit Judge, dissenting.  The Parker Retirement Savings Plan (or the "Plan" for short) allows employees of the Parker-Hannifin Corporation to save for retirement.  Michael Johnson and four other participants in the Plan allege that its administrators violated the Employee Retirement Income Security Act (ERISA) by selecting or retaining imprudent investment options.  (Like the majority, I will refer to the plaintiffs as "Johnson" and the defendant administrators as "Parker-Hannifin.")  My colleagues hold that Johnson's complaint states plausible claims that Parker-Hannifin violated its duty of prudence under ERISA.  This holding weakens an "important mechanism" to stop costly litigation over "meritless claims": motions to dismiss complaints.  *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).  I respectfully dissent.

Johnson first argues that Parker-Hannifin kept a set of imprudent target-date funds (the "Focus Funds") in the Plan.  As his support, he primarily alleges that the Focus Funds had worse returns than a target-date benchmark and top-performing target-date funds.  Yet his complaint tells us nothing about the Focus Funds' risk profiles or their mix of equity and bond investments.  The complaint also tells us nothing about the risk profiles of the benchmark and alternative funds.  And it tells us nothing about how the Focus Funds fit within the Plan's entire portfolio.  So Johnson's claim is analogous to suggesting that an administrator acted imprudently by including (safe) government bonds in a balanced portfolio because the bonds performed worse than (risky) stocks during a bull market.  Courts should not allow such claims to proceed.  Traditionally, we and other courts would have dismissed Johnson's claim for failing to show that the alternative options were "meaningful" comparators to the challenged funds.  *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1167 (6th Cir. 2022) (citation omitted).  My colleagues break new ground by holding otherwise.

Johnson next argues that Parker-Hannifin negligently selected higher-fee share classes for several funds in the Plan.  To imply Parker-Hannifin's negligence, the complaint alleges that the

Plan's large size gives the company bargaining power and that it did not choose the cheapest share classes. But "an obvious alternative explanation" exists for this choice: the Plan did not have enough money invested in the funds to qualify for the best rates. *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 567 (2007)). And while the complaint speculates that the fund providers would have waived any (unidentified) minimum investment thresholds, it should have to allege more facts to open the costly discovery process. *See Twombly*, 550 U.S. at 557–58.

### I. Challenge to the "Focus Funds"

The complaint first alleges that Parker-Hannifin imprudently kept a set of target-date funds in the Plan for several years. But its allegations fail to assert a plausible ERISA violation.

### A. Background ERISA Law

ERISA regulates "employee benefit plans." 29 U.S.C. §§ 1002(3), 1003(a), 1101(a). Among other things, it covers the defined-contribution plans employers create to help employees save for retirement (many of which are better known as "401(k) plans"). *See CommonSpirit*, 37 F.4th at 1162. In passing ERISA, Congress sought to achieve competing goals. It wanted both to encourage employers to create these plans (by adopting uniform standards that avoid large costs) and to ensure that employees receive promised benefits (by imposing duties on plan administrators and creating remedies for their breach). *See Conkright v. Frommert*, 559 U.S. 506, 516–17 (2010); *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 569–70 (1985). As part of this balancing act, Congress required administrators to meet standards of loyalty and care like the standards that the common law of trusts has long imposed on trustees. *See Cent. States*, 472 U.S. at 570; Restatement (Second) of Trusts §§ 170, 174 (Am. L. Inst. 1959).

This case concerns ERISA's duty of "care" (also called its duty of "prudence"). When managing a plan, fiduciaries must "discharge [their] duties" "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]" 29 U.S.C. § 1104(a)(1)(B). Congress wrote this language (requiring administrators to exercise "care, skill, prudence, and diligence") at perhaps the highest level of

generality.  And other than adopting a few concrete guideposts (such as the need to diversify plan assets, *see id.* § 1104(a)(1)(C)), ERISA does not offer more specific instructions about the conduct that administrators must undertake to stay within the law's general lanes of prudence.

Does this omission create a boundless test to decide whether an administrator breached the duty of prudence?  Not at all.  As a general matter, the Supreme Court has recognized that ERISA teems with language from the common law of trusts.  *See Cent. States*, 472 U.S. at 570.  So it has looked to trust law to interpret the Act.  *See id.*  As a specific matter, the Court has invoked this common-law analogy when applying ERISA's duty of prudence to investment decisions.  *See Hughes v. Nw. Univ.*, 595 U.S. 170, 175 (2022); *Tibble v. Edison Int'l*, 575 U.S. 523, 528–29 (2015).  In *Tibble*, the Court read the common law as compelling trustees to "exercise prudence" when *choosing* investments.  575 U.S. at 529.  And it added that the common law required trustees to *monitor* trust investments and remove those that later become imprudent.  *Id.*  *Tibble* thus read ERISA as imposing both duties on administrators.  *See id.* Ultimately, though, it chose to "express no view on the scope" of these investing and monitoring duties.  *Id.* at 531.

### B.  Johnson's Allegations

Johnson's allegations about the "target-date funds" implicate the questions that *Tibble* left open.  Companies often include a "suite" of the same target-date funds in their 401(k) plans. Compl., R.20, PageID 549.  An employee may choose the specific fund that "corresponds to the year" that the employee hopes to retire.  *Id.*  As the employee approaches this retirement date, the fund adjusts its investments by swapping out aggressive equities for conservative non-equities. *Id.*

In February 2014, Parker-Hannifin replaced its existing set of target-date funds with a new set: the "Focus Funds" that Northern Trust created in 2009.  *Id.*, PageID 555, 565.  The Focus Funds follow a "passive strateg[y]" by buying Northern Trust "index funds," which, in turn, invest in "various" assets.  *Id.*, PageID 555–56, 563.  Johnson's complaint does not identify the specific holdings in the Focus Funds or the funds' relative mixes of equities and bonds.  The complaint also does not allege that Parker-Hannifin acted imprudently when *selecting* the Focus

Funds.  Rather, it alleges that Parker-Hannifin imprudently *retained* the funds from "the end of January 2015" until "September 30, 2019" when it removed them.  *Id.*, PageID 568–69, 582.

What allegations support this claim that Parker-Hannifin should have removed the Focus Funds?  The complaint relies primarily on their performance.  Yet it alleges no facts telling us how the funds performed in *absolute* terms.  Did they gain 5% each year?  Lose 1%?  We do not know.  The complaint instead alleges facts about how the funds performed *relative* to other things: a target-date benchmark and three other target-date funds.  *Id.*, PageID 557–63, 566–69.  In 2011 and 2012, some of the Focus Funds overperformed the S&P target-date benchmark while others underperformed it.  *Id.*, PageID 558.  But the funds all began to underperform this benchmark in 2013 by as much as 7%.  *Id.*, PageID 559.  From 2010 to 2013, they also underperformed three target-date funds that the complaint calls some of the "top performers": those managed by T. Rowe Price, Vanguard, and TIAA-CREF.  *Id.*, PageID 560–64.  This underperformance continued after Parker-Hannifin added the Focus Funds to the Plan.  Between 2014 and 2017, each of the Focus Funds performed anywhere from 4% to 17% below the three top performers.  *Id.*, PageID 567–69.

Apart from a comparison to alternatives, the complaint raises two other allegations.  It alleges that Northern Trust created the Focus Funds in "mid to late 2009" and that the funds had "no live performance history" before then.  *Id.*, PageID 555–56.  At that time, Northern Trust marketed the funds using a "hypothetical performance" model showing how they would have performed in the past.  *Id.*, PageID 556.  The complaint alleges that professionals do not typically rely on this back-tested data because "it can be easily manipulated[.]"  *Id.*, PageID 557.

"[I]n 2013," moreover, Northern Trust "changed 5 out of the 10 index funds" in which the Focus Funds invested.  *Id.*, PageID 563.  The complaint alleges that an ordinary investor would have considered this "significant" turnover before investing in the funds.  *Id.*, PageID 563–64.  The complaint adds that "[t]he average turnover for all of the funds in the Focus Fund series was 90 percent," which it describes as "astoundingly high" even for actively managed funds.  *Id.*, PageID 564.  By comparison, all target-date funds had an average turnover of 23.5% in 2010.  *Id.*

I will address each of these three allegations in turn, starting with Johnson's primary claim.

## C. Do the Allegations of Relative Underperformance Support an Imprudence Claim?

The complaint relies on the Focus Funds' relative underperformance to suggest that Parker-Hannifin violated ERISA's duty of prudence by keeping them in the Plan. To evaluate this theory, we should distinguish a substantive question of ERISA law from a procedural question of pleading law. As a matter of substance: When can one security's underperformance as compared to another security help show a violation of ERISA's duty of prudence? My answer: This fact—without more—is irrelevant. So that leads to the procedural question: Can this relative underperformance nevertheless help allege a breach of the duty of prudence at the pleading stage? My answer: Likely not—but at least not without showing that the other security represents a "meaningful benchmark."

### 1. When can one security's underperformance as compared to another security help show a violation of ERISA's duty of prudence?

This question (like all statutory questions) begins with ERISA's text. Recall that it compels administrators to monitor investments "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]" 29 U.S.C. § 1104(a)(1)(B). And recall that the Supreme Court has told us to interpret this text using the common law of trusts. *See Tibble*, 575 U.S. at 528–29. But the Court has been less than clear on the relevant time for identifying the common-law rules. *Tibble* cited common-law authorities from as far back as the 1800s to as recent as 2009. *See id.* Yet one might think we should focus on the common law as it existed in 1974 when Congress passed ERISA. *Cf. Pasquantino v. United States*, 544 U.S. 349, 360–61 (2005). That said, ERISA also directs fiduciaries to use the "*then prevailing*" "care, skill, prudence, and diligence" in their decisionmaking. 29 U.S.C. § 1104(a)(1)(B) (emphasis added). Perhaps this text could be read to change the nature of the legal rules as the common law develops. *Cf. Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 209–11 (2019). Or maybe the text tells us to keep the rules "fixed" but to apply them to changed facts. *Kimball v. Whitney*, 123 N.E. 665, 666 (Mass. 1919). For example, even

if prudent managers avoided stocks at one time, those managers commonly include them in a balanced portfolio today. *See Trustee's Duties Regarding Investments*, 4 Real Prop. Prob. & Tr. J. 604, 613 (1969); Restatement (Second) of Trusts § 227 cmt. m. Either way, I am not sure this difference matters in this case.

What does the common law say about prudent investments? Historically, different States followed different rules. *See* Gilbert Thomas Stephenson, *Estates and Trusts* 247 (3d ed. 1960). Some identified the specific investments that trustees could (and could not) make; others followed a general "prudent" investor rule first established in *Harvard College v. Amory*, 26 Mass. 446, 460–61 (1830). *See* Stephenson, *supra*, at 247–50; Mayo Adams Shattuck, *The Development of the Prudent Man Rule for Fiduciary Investment in the United States in the Twentieth Century*, 12 Ohio St. L.J. 491, 499–504 (1951). ERISA unambiguously adopted the latter approach—consistent with the clear "trend" in 1974. 3 Austin Wakeman Scott & William Franklin Fratcher, *The Law of Trusts* § 227.5, at 442 (4th ed. 1988); *see also* John H. Langbein & Richard A. Posner, *Market Funds and Trust-Investment Law*, 1976 Am. Bar Found. Res. J. 1, 3–6.

Under this prudent-investor rule, I have not found authorities suggesting that an investment might be "imprudent" simply because it has a lower rate of return than some other option. For three reasons, I would hold that these relative rates of return *by themselves* tell us nothing useful about an administrator's prudence either in buying a security or in keeping it.

*Reason One*: The common law's duty of prudence imposes "standards of *conduct*" on trustees, not standards "of *performance*" on investments. Amy Morris Hess et al., *Bogert's The Law of Trusts and Trustees* § 612, Westlaw (database updated July 2024) (emphasis added); *see In re Morgan Guar. Tr. Co. of N.Y.*, 396 N.Y.S.2d 781, 784–85 (N.Y. Surrogate's Ct. 1977); *In re Comstock's Will*, 17 N.W.2d 656, 661 (Minn. 1945). Trustees must act with "care," "skill," and "caution" when making investment decisions. *See* 3 Scott, *supra*, §§ 227.1–227.3, at 435–39. The duty of care requires them to investigate a security's "safety" and "probable income" using sources on which prudent investors typically rely. Restatement (Second) of Trusts § 227 cmt. b. And the duty of skill requires them to analyze the data with at least the expertise of an ordinary prudent investor. *Id.* § 227 cmt. c. So when deciding whether a trustee has breached

the duty of prudence by buying securities, courts evaluate the "extent of the investigation made by the trustee before investing" in them.  George G. Bogert & George T. Bogert, *Handbook of the Law of Trusts* § 106, at 388 (5th ed. 1973).  And when deciding whether a trustee has breached the duty of prudence by keeping securities, courts ask whether the trustees made an adequate "inspection" to ensure that they remained prudent.  *Id.* § 107, at 393; *see* Restatement (Second) of Trusts § 231 cmt. b; 3 Scott, *supra*, § 231, at 536–37.  If trustees investigate and monitor their investments, though, courts do not hold them liable just because the securities "fall in value."  3 Scott, *supra*, § 231, at 538–39.

Given this common-law backdrop, courts have read ERISA to impose "largely a process-based" duty of prudence requiring administrators to adequately investigate before deciding whether to buy or keep a security.  *CommonSpirit*, 37 F.4th at 1164; *see Pizarro v. Home Depot, Inc.*, 111 F.4th 1165, 1173 (11th Cir. 2024); *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 278 (8th Cir. 2022); *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013); *Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983); 29 C.F.R. § 2550.404a-1(b)(1)(i).  And courts judge an administrator's conduct based only on the facts that existed at the time of a decision—not on facts that occur later.  *See CommonSpirit*, 37 F.4th at 1164; *Renfro v. Unisys Corp.*, 671 F.3d 314, 322 (3d Cir. 2011).  So they will not impose liability just because an investment has poor "results."  *Matousek*, 51 F.4th at 278; *Pizarro*, 111 F.4th at 1173; *see Morgan Stanley*, 712 F.3d at 721.

This focus on "process" poses a problem for Johnson.  The complaint alleges that Parker-Hannifin violated its duty of prudence by keeping the Focus Funds because of the funds' "significant and persistent underperformance" as compared to three top-performing target-date funds from 2013 to 2017 (and the S&P target-date benchmark from 2013 to 2014).  Compl., R.20, PageID 568–69.  But the complaint alleges no facts about the investigation that Parker-Hannifin undertook when deciding whether to keep the Focus Funds from 2015 to 2019.  Did Parker-Hannifin have "regular semi-annual or annual reviews" of the portfolio?  Bogert, *Handbook*, *supra*, § 107, at 393.  Did Parker-Hannifin consider the Focus Funds' performance?  Did it learn of and evaluate any "change of circumstances" about the Focus Funds?

Restatement (Second) of Trusts § 231 cmt. a. We do not know. The complaint says nothing about Parker-Hannifin's "conduct" and instead talks mainly about the Focus Funds' "performance." Hess, *Bogert's The Law of Trusts*, *supra*, § 612. It thus flips the common-law duty of prudence on its head.

*Reason Two*: The common law's duty of prudence does not require trustees to seek the highest return at all costs. Quite the contrary. A trustee's investment choices must balance two duties: the duty to "preserve the trust property" and the duty "to make the trust property productive." Restatement (Second) of Trusts §§ 176, 181; *see* 3 Scott, *supra*, § 227, at 431. These duties often conflict. On the one hand, a trustee might best protect trust funds by locking them away in a safe. But this zero-risk option (at least in times of no inflation) has zero reward: the funds would earn no income. *See* Restatement (Second) of Trusts § 181 cmt. c. On the other hand, a trustee might obtain the greatest return by investing the funds in a "speculative" start-up with a small chance of an astronomical gain and a large chance of a bankruptcy filing. *Id.* § 227 cmt. e. But this high-reward option would ignore the grave risks to the principal. *See id.* Both extremes are imprudent because they implement only one of these duties at the expense of the other.

Trustees instead must choose investments that have a reasonable ratio between the "risk of loss" and the "opportunity for gain." *Id.* How should trustees identify the optimal ratio? The common law generally deemed some unusually risky investments (such as starting and operating the trustee's own business) as imprudent. *See, e.g.*, *id.* § 227 cmt. f. Otherwise, no uniform answer exists to this question because the right ratio rests on "subjective judgments" about the "appropriate degree of risk" and "all of the relevant trust and beneficiary circumstances." Restatement (Third) of Trusts § 90 cmts. e, k (Am. L. Inst. 2007); *see* 3 Scott, *supra*, § 227.12, at 475–79. If anything, the traditional duty of caution required trustees to give "primary consideration" to ensuring the safety of the principal at the expense of the returns. Restatement (Second) of Trusts § 227 cmt. e. It thus required trustees to obtain only "income" that was "*reasonable* in amount," not the *maximum* amount. *Id.* (emphasis added); *see* Restatement (Third) of Trusts § 90 cmt. e ("reasonable" return); *King v. Talbot*, 40 N.Y. 76, 86 (1869)

("just" return).  So trustees "[o]rdinarily" could "invest in government securities" even though these securities often underperform equities.  Restatement (Second) of Trusts § 227 cmt. f.

Courts interpreting ERISA's duty of prudence have recognized the same risk-return conflict between minimizing loss and maximizing gain.  As the Supreme Court has noted, an administrator's investment decisions will "implicate difficult tradeoffs," so courts must respect the "range of reasonable" choices that administrators can make.  *Hughes*, 595 U.S. at 177; *see* 29 C.F.R. § 2550.404a-1(b)(2)(i).  Administrators "likely" can choose from "many objectively prudent" investments that all have different risk-reward ratios.  *Pizarro*, 111 F.4th at 1176.  As a matter of law, then, administrators may choose between actively managed and passively managed funds without violating the duty of prudence either way.  *CommonSpirit*, 37 F.4th at 1165.

Indeed, this notion that there is no single prudent investment adds another requirement for plaintiffs who seek to recover "losses to the plan" allegedly "resulting from" breaches of the duty of prudence.  29 U.S.C. § 1109.  Administrators must not only have committed a *process* error; that error must have caused a plan to invest in a *substantively* "improvident" security.  *Kuper v. Iovenko*, 66 F.3d 1447, 1460 (6th Cir. 1995), *abrogated on other grounds by Dudenhoeffer*, 573 U.S. at 425.  "[A]s then-Judge Scalia vividly put it," *Pizarro*, 111 F.4th at 1176, an incompetent administrator who relies on "astrology" to invest has not caused a loss if that process led it to buy "a highly regarded 'blue chip' stock" (even if the stock later loses value), *Fink v. Nat'l Sav. & Tr. Co.*, 772 F.2d 951, 962 (D.C. Cir. 1985) (Scalia, J., concurring in part and dissenting in part).

This risk-return principle also conflicts with Johnson's theory that the Focus Funds' underperformance shows Parker-Hannifin's imprudence.  For one thing, the complaint says nothing about the Focus Funds' "risk and return objectives[.]"  Restatement (Third) of Trusts § 90(a).  Did the Focus Funds have similar "risk-return profiles" and so pose a similar "risk of loss" to the comparators?  *Pizarro*, 111 F.4th at 1180; 29 C.F.R. § 2550.404a-1(b)(2)(i).  Or did the Focus Funds include more bond holdings to reduce the risk of loss in a bear market?  The complaint's naked *return* allegations (without any *risk* allegations) do nothing to show whether the Focus Funds fell outside the "range of reasonable" options.  *Hughes*, 595 U.S. at 177.  For

another thing, Johnson alleges no facts about how the Focus Funds performed in *absolute* terms. For all we know, they generated an average return of 9% a year (compared to, say, a 10% return for the top performers). I doubt many would call this "return" "[un]reasonable," Restatement (Third) of Trusts § 90 cmt. e, or treat the funds as "objectively [im]prudent" as a result, *Renfro*, 671 F.3d at 322. Administrators do not breach the duty of prudence just because they do not pick the "best performing fund." *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018).

*Reason Three*: The common law's duty of prudence requires trustees to diversify trust property across a range of investments to reduce the harm that loss from one security can cause. *See* Restatement (Second) of Trusts § 228; 3 Scott, *supra*, § 228, at 501. Trustees thus must choose "each investment not as an isolated transaction but in its relation to the whole of the trust estate." 3 Scott, *supra*, § 227.12, at 477; *see* Restatement (Third) of Trusts § 90(a). To evaluate the propriety of a single investment, then, courts consider how it fits in with "the portfolio as a whole[.]" 3 Scott, *supra*, § 227, at 435. Something that looks excessively risky alone might look reasonable when held together with conservative investments. *See* Langbein, *supra*, 1976 Am. Bar Found. Res. J. at 26; Bevis Longstreth, *Modern Investment Management and the Prudent Man Rule* 156–57 (1986). But courts should not take this principle too far. Trustees cannot avoid liability for imprudent investments by setting off losses from those investments against gains from prudent ones. Restatement (Second) of Trusts § 213 & cmt. b; 3 Scott, *supra*, § 231.1, at 301–04.

ERISA's duty of prudence adheres to this framework too. Indeed, Congress itself adopted the diversification requirement. ERISA generally instructs administrators to "diversify[] the investments of the plan so as to minimize the risk of large losses[.]" 29 U.S.C. § 1104(a)(1)(C). Courts thus must evaluate the prudence of an investment against "the portfolio as a whole." *Morgan Stanley*, 712 F.3d at 716–17. A prudent administrator, for example, would not hastily discard the riskier parts of a "well-constructed portfolio" simply because of "disappointing short-term losses" during a downturn. *CommonSpirit*, 37 F.4th at 1166. Just like common-law courts, though, the Supreme Court in *Hughes* added that administrators may not

insulate themselves from imprudent investments solely by including prudent choices in a plan. *See* 595 U.S. at 176.

Yet again, Johnson's theory ignores this principle. The complaint tries to make out an imprudence claim using a one-to-one comparison between the Focus Funds and other target-date funds without considering the Plan's *other investments*. In fact, the complaint does not discuss the nature of those other options at all. *Compare* Compl., R.20, PageID 555–75, *with* Plan, R.47-2, PageID 1276–80. It thus asks us to evaluate the prudence of the Focus Funds "in isolation" rather than as part of the Plan's entire "portfolio" of options. *Morgan Stanley*, 712 F.3d at 716–17.

In sum, the Focus Funds' relative underperformance—without more—would not help Johnson prove at *trial* that Parker-Hannifin violated its duty of prudence by retaining the funds.

> *2. Can an investment's relative underperformance nevertheless help allege a plausible breach of the duty of prudence?*

But this case remains at the *pleading* stage. So we must also ask whether the Focus Funds' relative underperformance can at least help allege an imprudence claim to allow Johnson to seek discovery. That distinct question starts with the pleading rules in the ERISA context. As I have explained, ERISA serves competing goals. The duty of prudence serves one of them: protecting beneficiaries. *See Cent. States*, 472 U.S. at 569–70. But we must also account for Congress's desire to encourage the formation of these plans. *See Conkright*, 559 U.S. at 517. And courts would undercut that goal if they oversaw ERISA cases in a way that generated high "litigation expenses" even for meritless claims. *Id.* (citation omitted). As an "important mechanism" to implement this competing goal, the Supreme Court has told us to weed out frivolous claims by giving "careful, context-sensitive scrutiny" to a complaint. *Dudenhoeffer*, 573 U.S. at 425.

In this ERISA context, therefore, the Court has carefully applied its "plausibility" test for evaluating complaints. *See id.* at 425–30. Under that test, courts must ignore "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action"—such as a generic claim that an administrator imprudently retained an investment. *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009). They then must ask whether the remaining well-pleaded facts "plausibly give rise to an entitlement to relief." *Id.* at 679. And the complaint will not meet this test if the facts suggest, at most, a "mere possibility of misconduct[.]" *Id.*

When evaluating an ERISA complaint against these standards, courts must remember that the duty of prudence turns on an administrator's "conduct" (not on a security's "performance"). Hess, *Bogert's The Law of Trusts*, *supra*, § 612; *see CommonSpirit*, 37 F.4th at 1164. Yet plaintiffs typically will not know the conduct that administrators undertook when keeping securities in a plan. *See Meiners*, 898 F.3d at 822. So complaints often will not "*directly*" allege that administrators engaged in improper acts (say, ignoring the portfolio for years). *Morgan Stanley*, 712 F.3d at 718. Johnson's complaint proves this point since it alleges no facts about Parker-Hannifin's acts. Instead, ERISA complaints typically rely on "circumstantial factual allegations" to suggest that the administrators acted imprudently. *Id.*; *see also Meiners*, 898 F.3d at 822.

Can an investment's relative underperformance as compared to another security create a "circumstantial" case that the administrator behaved imprudently? Given all that I have said, I am skeptical that this comparison could ever state an imprudence claim. To plead a *process* problem using circumstantial factors, one might think the test should at least require plaintiffs to plead facts plausibly suggesting that the investment itself was what then-Judge Scalia called a "patently unsound" investment. *Fink*, 772 F.2d at 962 (Scalia, J., concurring in part and dissenting in part); *see Pizarro*, 111 F.4th at 1176; *Kuper*, 66 F.3d at 1460. And I would think that securities with healthy returns year after year could fall within the "range of reasonable" options even if they underperformed a top-performing security or a benchmark. *Hughes*, 595 U.S. at 177. Is it really the case that all securities that fall below the top (which seemingly could cover most securities) or some average (which seemingly could cover half) are substantively imprudent? *Cf. Davis v. Wash. Univ. of St. Louis*, 960 F.3d 478, 486 (8th Cir. 2022). As one early source suggested, if a fund meets its own disclosed investment objectives, "the fact that [it] is outperformed by many others will have little bearing in a court test of prudence." Bruce W. Marcus, *The Prudent Man: Making Decisions Under ERISA* 77 (1978); *see Pizarro*, 111 F.4th at 1180–81.

At the least, a complaint's allegations that one security underperformed another are meaningless unless the complaint includes enough details about the two options to suggest that they are interchangeable in all material respects but their returns. Indeed, we have already held that this type of comparison cannot act as a "building block" for an imprudence claim unless the comparator qualifies as a "meaningful benchmark" to the challenged security. *CommonSpirit*, 37 F.4th at 1167 (quoting *Meiners*, 898 F.3d at 822). Without such details, an "obvious alternative explanation" exists for the underperformance: the challenged fund has a lower risk (and so a lower chance of a higher return). *Id.* (quoting *Twombly*, 550 U.S. at 567).

This meaningful-benchmark requirement dooms Johnson's reliance on the Focus Funds' underperformance. The complaint does not plead facts to suggest that any of the purported comparators qualify as meaningful benchmarks. Start with the three target-date funds that the complaint calls the "top performers": the Vanguard Target Retirement Trust Plus Funds, the TIAA-CREF Lifecycle Index Funds, and the T. Rowe Price Retirement Funds. Compl., R.20, PageID 560–63. The complaint's own allegations disqualify the T. Rowe Price funds. *Id.*, PageID 562. Although the Focus Funds followed a passive strategy by investing in index funds, the complaint alleges that T. Rowe Price followed an unidentified "actively managed" approach. *Id.* And we have held that complaints cannot treat active and passive funds as comparable because they follow different investment strategies. *See CommonSpirit*, 37 F.4th at 1166–67.

More importantly, the complaint's omissions disqualify all three funds as comparators. As noted, the complaint does not identify the relevant "risk profiles" of either the Focus Funds or the three comparator funds. *Id.* at 1167. We have no idea what assets the Focus Funds held. So we do not know their mix of conservative nonequity investments (with lower risks and lower potential returns) and aggressive equity investments (with higher risks and higher potential returns). Nor does the complaint tell us the mix of assets in any comparator. *See Matousek*, 51 F.4th at 281. In addition, the complaint does not describe the other options the Plan offers to beneficiaries. Are some of these options risky, which might call for a more conservative target-date fund? We do not know. For its part, Parker-Hannifin says that we may look at outside-the-complaint information revealing that the Focus Funds had a much more conservative portfolio made up of more non-equities. Appellees' Br. 30–31. And Parker-Hannifin says that the entire

Plan included a risky investment option that primarily invested in the company's own individual stock. *Id.* at 8, 33. We need not decide whether we may look at this information now because Johnson bore the burden of pleading a meaningful benchmark. The complaint's silence does not cut it.

Turn to the other comparator: the S&P target-date benchmark. The complaint offers no details about this benchmark. It first alleges that the Focus Funds "significantly underperformed industry-accepted target date benchmarks" that professionals use. Compl., R.20, PageID 557. The complaint then suggests: "The S&P target date fund benchmark is one such benchmark." *Id.* It goes on to compare the Focus Funds' performance to this benchmark from 2010 to 2014. *Id.*, PageID 557–59, 567. Yet, as the district court recognized, the benchmark is not a "fund" that administrators can select for retirement plans. *See Johnson v. Parker-Hannifin Corp.*, 2023 WL 8374525, at *6 (N.D. Ohio Dec. 4, 2023). And the complaint includes no details about the benchmark's hypothetical contents. Another court suggested that it represents a hypothetical composite of target-date funds with different strategies and risk profiles. *Hall v. Cap. One Fin. Corp.*, 2023 WL 2333304, at *2, *7 (E.D. Va. Mar. 1, 2023). Given this diverse composition, Parker-Hannifin has cited outside-the-complaint materials calling the benchmark "all but useless" in helping investors evaluate a fund's performance. *Johnson*, 2023 WL 8374525, at *6 (quoting *Selecting a Target-Date Benchmark*, Morningstar, at 1 (2017)); Appellees' Br. 34–35. But again, we need not decide whether we can consider these materials. Johnson bore the burden of pleading the details showing that this benchmark qualifies as a meaningful comparator. He should not get a ticket to discovery by saying *nothing* on the subject. *Cf. Dudenhoeffer*, 573 U.S. at 425.

Regardless, the complaint does not even allege that the Focus Funds underperformed this S&P target-date benchmark in 2015 or later. Rather, it alleges underperformance as against this benchmark only through 2014. Compl., R.20, PageID 557–59, 566–67. After that date, the complaint alleges that the Focus Funds underperformed only the three comparator funds. *Id.*, PageID 569. So we do not even know whether the Focus Funds underperformed this benchmark during the time that Parker-Hannifin allegedly acted imprudently by keeping those Funds.

My colleagues fail to convince me otherwise. *First*, they assert that plaintiffs do not need to plead a meaningful benchmark. If they mean to suggest that plaintiffs need not identify such a benchmark when relying on an investment's *relative underperformance*, they depart from our law and create a circuit split. We have twice rejected complaints that have alleged imprudence claims using "available alternatives" because the complaints did not show that the alternatives resembled the challenged funds. *Forman v. TriHealth, Inc.*, 40 F.4th 443, 449 (6th Cir. 2022); *see CommonSpirit*, 37 F.4th at 1167. And other courts have adopted this "meaningful benchmark" test. *Matousek*, 51 F.4th at 278 (citation omitted); *see Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1148–49 (10th Cir. 2023); *Albert v. Oshkosh Corp.*, 47 F.4th 570, 581–82 (7th Cir. 2022).

That said, I agree that our pleading test does not require a meaningful benchmark in all cases. Plaintiffs must show that an alternative investment materially resembles a challenged fund *only* if their complaint tries to make out a case of imprudence based on the alternative's superior returns. But the complaint can try to make out an imprudence claim in other ways. If, for example, plaintiffs assert *direct* allegations of imprudence (say, a government investigation revealed that the administrators did not review their portfolio for years), those allegations might suffice.

*Second*, my colleagues suggest that the S&P target-date benchmark qualifies as a "meaningful" one. As I have said, though, the complaint pleads no details about this benchmark. What is its risk profile? What is its bond to equity ratio? Does it follow a passive or active strategy? None of these omissions matter to my colleagues because they suggest that Northern Trust designed the Focus Funds to match this benchmark. I cannot find this allegation. The complaint says that the Focus Funds were "index funds designed to meet [unidentified] industry-recognized benchmarks." Compl., R.20, PageID 560. It does not say that Northern Trust developed the funds to match the S&P target-date benchmark in particular. In fact, the complaint does not identify any benchmark that the Focus Funds were designed to match or even identify their investments (apart from the claim that they invested in index funds). *Id.*, PageID 556. So Johnson does not ask us to decide whether "apples" are better than "oranges," *CommonSpirit*, 37 F.4th at 1166; he asks us to guess whether one mystery fruit is better than

another mystery fruit.  Such "speculative" claims do not entitle plaintiffs to discovery.  *Twombly*, 550 U.S. at 555.

*Third*, my colleagues suggest that the Eighth Circuit has allowed a plaintiff to use a similar benchmark to plead an investment's imprudence.  But they overread the decision on which they rely: *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009).  The plaintiff there alleged that Wal-Mart, the administrator, violated its duties of loyalty and care by keeping low-return funds in its plan so that Merrill Lynch, its trustee, could receive excessive fees.  *Id.* at 589–90.  Yet the complaint made "specific comparisons" to "allegedly similar" "index funds" "available in the market" that performed better and charged lower fees.  *Id.* at 590.  It also alleged that the challenged funds "underperformed the market indices they were designed to track" and that the better alternative funds tracked the same indices.  *Id.* at 596, 598.  Unlike my colleagues, I would not read *Braden* as suggesting that the complaint sufficed *solely* because the funds underperformed these indices.  Indeed, the court itself suggested that its "ultimate conclusions rest on the totality of the specific allegations."  *Id.* at 596 n.7.  And unlike the plaintiff in *Braden*, Johnson identifies no funds comparable to the Focus Funds.  Besides, as I have said, Johnson's complaint also does not allege that the Focus Funds were designed to track the S&P target-date benchmark.

Confirming my reading, the Eighth Circuit has since rejected efforts to rely on an industry benchmark like the S&P target-date benchmark as a comparator.  *See Matousek*, 51 F.4th at 281–82.  In *Matousek*, the plaintiffs argued that the challenged funds performed worse (and had higher fees) than the averages in their relevant peer groups.  *See id.*  But the court rejected the use of these peer-group averages because of the lack of information about both the challenged funds and "the funds in each peer group."  *Id.* at 281.  This concern matches my own.  We have little information about the Focus Funds' objectives and risk profiles or about the S&P target-date benchmark.  If anything, then, my colleagues' reliance on this benchmark conflicts with *Matousek*.

In sum, the complaint's performance allegations are irrelevant.  I would ignore them when deciding whether the complaint plausibly suggests that Parker-Hannifin violated its duty of prudence by retaining the Focus Funds in the portfolio between 2015 and 2019.

D. Do Johnson's Other Allegations Plausibly Establish this Imprudence Claim?

This conclusion leaves Johnson's backup allegations. He claims that the Focus Funds lacked an adequate performance history and had a high turnover rate. Neither theory works.

*Performance History*. The complaint alleges that Northern Trust created the Focus Funds in "mid to late 2009" and that these funds lacked a "live performance history" before then. Compl., R.20, PageID 556. So when "promoting these new funds in 2009 and 2010," Northern Trust allegedly used "back-tested" data that rested on an unreliable model about how the Focus Funds would have performed in prior years if they had existed. *Id.*

To their credit, my colleagues recognize the problems with this allegation. As for the first problem, Parker-Hannifin did not select the Focus Funds until February 2014. By then, the funds had existed for years. Johnson cites no authorities from the common law of trusts or ERISA that would treat this years-long performance period as inadequate. *Cf. Johnson*, 2023 WL 8374525, at *9. In fact, the complaint itself does not treat the period as inadequate. It also alleges that one of the "top performers" (TIAA-CREF's target-date fund) had "over 5 years of performance history as of 2015," giving it a similar creation date in 2009. Compl., R.20, PageID 561; Appellees' Br. 39–40. If this performance history was long enough for Parker-Hannifin to invest in the TIAA-CREF funds, how could it be too short for Parker-Hannifin to invest in the Focus Funds?

As for the second problem, the complaint does not challenge Parker-Hannifin's *selection* of the Focus Funds in February 2014. It challenges Parker-Hannifin's *retention* of the funds in January 2015. Compl., R.20, PageID 568–69, 582. Johnson likely limited the suit in this way to avoid ERISA's six-year statute of repose. *See* 29 U.S.C. § 1113(1). But this choice makes the imprudence claim even further removed from Northern Trust's use of back-tested data in 2009 and 2010. All told, the complaint has not "plausibly pleaded" that Parker-Hannifin relied on hypothetical data rather than real-world data when keeping the Focus Funds. *CommonSpirit*, 37 F.4th at 1166. Nor does it raise a "reasonable inference" that Parker-Hannifin failed to adequately investigate before making this retention decision. *Morgan Stanley*, 712 F.3d at 720.

*High Turnover.*   The complaint next alleges that Northern Trust switched half of the index funds that the Focus Funds held in 2013.  Compl., R.20, PageID 563.  This change led the Focus Funds to have an "astoundingly high" "average turnover" of "90 percent[.]"  *Id.*, PageID 564.

These high-turnover allegations likewise fail to "plausibly plead" that Parker-Hannifin acted imprudently.  *CommonSpirit*, 37 F.4th at 1166.  The complaint alleges that the high turnover occurred in 2013 when Parker-Hannifin was deciding whether to select the Focus Funds.  But again, Johnson challenges Parker-Hannifin's decision to keep the funds in 2015.  So the turnover does not qualify as a "change in circumstances" that could render the Focus Funds "no longer a proper investment."  Restatement (Second) of Trusts § 231 cmt. a.  And I fail to see how *preselection* information about high turnover alone could allow a jury to "plausibly infer" that Parker-Hannifin did not adequately monitor the funds later without any allegations of *continued* high turnover.  *CommonSpirit*, 37 F.4th at 1162; *see Morgan Stanley*, 712 F.3d at 721.

To the extent that my colleagues interpret the complaint as alleging that the turnover continued in 2015, that reading would be mistaken.  The complaint's only "well-pleaded factual allegations" assert turnover in 2013.  *Iqbal*, 556 U.S. at 679.  In a section entitled "Background of the Northern Trust Focus Funds," the complaint alleges that Northern Trust switched out five index funds in 2013 and that the "material changes" caused a 90% turnover.  Compl., R.20, PageID 555, 563–64.  In the next section entitled "Defendants Selected the Focus Funds for the Plan," the complaint alleges that Parker-Hannifin chose the funds in 2013 for inclusion in 2014.  *Id.*, PageID 564–65.  And it describes the turnover "upheaval" as occurring "during the time" of this selection.  *Id.*, PageID 564.  In the years after this selection, the complaint asserts that the Focus Funds "*continued* to substantially underperform" the S&P benchmark or the three other funds.  Compl., R.20, PageID 566.  It alleges no specific facts about turnover during these years.

And my colleagues do not suggest that high turnover in 2013 would *alone* suffice to plausibly plead an imprudence claim.  Rather, they conclude that we must read these turnover allegations *combined* with the underperformance allegations.  As I have said, however, I find those allegations irrelevant because of Johnson's failure to allege a meaningful benchmark.  In my view, then, Johnson is left with nothing but this allegation of past turnover in 2013.  That

allegation does not state a plausible claim that Parker-Hannifin imprudently retained the Focus Funds years later.

## II. Challenge to Excessive Fees

The complaint also alleges that Parker-Hannifin imprudently selected fund share classes that had higher fees than other share classes of the same funds. I view this issue as a closer one. Still, the same chain of reasoning leads me to conclude that these allegations likewise fall short.

Start with Johnson's allegations. Fund providers often offer different classes of fund shares that have the same attributes (including returns) and differ only in the annual fees that the providers charge. Compl., R.20, PageID 571–72. Institutional investors who buy the largest amounts of a fund generally get the lowest-fee shares. *Id.* According to the complaint, though, Parker-Hannifin invested in share classes for several funds that were not the least expensive. It invested in Class K of the Focus Funds, which charged .07% of the fund assets each year in fees. *Id.*, PageID 573. But Class J charged only .02% in fees. *Id.* The complaint also suggests that Parker-Hannifin picked share classes of three Vanguard funds (the Vanguard Total Bond Market Index, the Vanguard Extended Market Index, and the Vanguard Total International Stock Index) that came with higher fees (.05%, .07%, and .10%, respectively) than the fees charged for the least expensive classes (.04%, .05%, and .07%, respectively). *Id.*, PageID 574. Because the massive Plan had over $4 billion in assets, the complaint asserts, Parker-Hannifin had "tremendous bargaining power" to obtain the lowest-fee share classes from Northern Trust and Vanguard. *Id.*, PageID 538, 572. The complaint adds that "[t]o the extent" Northern Trust or Vanguard required certain "minimum investment thresholds" to obtain these lower-fee shares, the providers would have "waived" those thresholds for Parker-Hannifin due to the Plan's size. *Id.*, PageID 572–73.

Do these allegations plausibly establish that Parker-Hannifin failed to act with the required "care, skill, prudence, and diligence"? 29 U.S.C. § 1104(a)(1)(B). I will again begin with the common law of trusts, given the Supreme Court's instructions. *See Tibble*, 575 U.S. at 528–29. The common law allows trustees to "incur expenses which are necessary or appropriate to carry out the purposes of the trust," but trustees must ensure that the expenses are no "greater"

"than is reasonable under the circumstances[.]" Restatement (Second) of Trusts § 188 & cmt. f; *see also* 3 Scott, *supra*, § 188, at 52. That is, trustees must be "cost-conscious" when using trust assets to pay expenses for administering the trust. Restatement (Third) of Trusts § 88 cmt. a.

Courts have extended this logic to ERISA. *See Forman*, 40 F.4th at 450; *see also Mator v. Wesco Distrib., Inc.*, 102 F.4th 172, 190–91 (3d Cir. 2024); *Hughes v. Nw. Univ.*, 63 F.4th 615, 627 (7th Cir. 2023); *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 107–14 (2d Cir. 2021); *Davis*, 960 F.3d at 483; *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016). So, for example, administrators would incur unreasonable expenses in violation of ERISA's duty of prudence if they negligently selected the highest-fee "retail" share classes (which any individual investor could buy) rather than cheaper "institutional" classes that they could have chosen given the plan's size. *See Forman*, 40 F.4th at 446–47, 450. At the same time, the common-law duty that ERISA incorporates requires administrators to act reasonably—not superbly. *See* Restatement (Third) of Trusts § 88. Administrators thus do not violate this duty just because they fail to obtain the "cheapest" fees that only savvy business lawyers could have achieved through vigorous negotiations. *Braden*, 588 F.3d at 596 n.7 (citation omitted); *see Albert*, 47 F.4th at 581.

So what does it take to plead that an administrator negligently incurred the excessive costs that will assert a plausible violation of the duty of prudence? We addressed this pleading question in *Forman*. There, we held that participants in TriHealth's retirement plan plausibly alleged that TriHealth had imprudently selected "pricier retail shares" rather than cheaper "institutional shares" for seventeen mutual funds in its plan. 40 F.4th at 450. Among other allegations, the complaint explained that the plan had almost $500 million in assets and that the seventeen mutual-fund providers had offered cheaper share classes to several other retirement-plan clients. *Id.* at 450, 453. The complaint also asserted that TriHealth qualified for the institutional shares. *Id.* at 453. To be sure, we reasoned that TriHealth might later justify its retail-share choice on the ground that it could not "qualify for the less expensive" institutional shares or that it had agreed to a "revenue-sharing arrangement" that made the retail shares cheaper. *Id.* at 450. But we saved these theories for discovery because the participants had plausibly pleaded TriHealth's "mismanagement." *Id.*; *see Davis*, 960 F.3d at 483. At the same

time, *Forman* clarified that this "context-sensitive" "inquiry" depends on each complaint's factual allegations. 40 F.4th at 453 (quoting *Dudenhoeffer*, 573 U.S. at 425). So we clarified that ERISA plaintiffs cannot obtain a "universal golden ticket" to discovery merely by alleging that a large plan's administrators did not obtain all potential "volume-based discounts" for the plan that a fund provider offered. *Id.*

In my view, Johnson asks us to award him such a "golden ticket" here. *Id.* The complaint alleges that Parker-Hannifin operates a massive Plan with over $4 billion in assets and thus has "tremendous bargaining power" to seek out good share classes from fund providers. Compl., R.20, PageID 538, 572. And it alleges that Parker-Hannifin did not receive the cheapest possible fees for the Focus Funds and for three Vanguard funds. *Id.*, PageID 573–74.

But the complaint does not allege much else. To start, it makes some conclusory allegations that we need not accept as true. It, for example, suggests that the "[l]ower-cost share classes" that Parker-Hannifin did not obtain "were readily available." Compl., R.20, PageID 572. And it suggests that the (unidentified) "investment provider" of the funds in the Plan would have "waived" any "minimum investment thresholds for the lowest-cost institutional shares[.]" *Id.* These allegations strike me as just as conclusory as those the Supreme Court refused to accept in *Twombly* and *Iqbal*. The complaint in *Twombly* similarly alleged that telecommunications companies had agreed not to compete in each other's territories. 550 U.S. at 564 & n.9. But the Court held that these allegations were "merely legal conclusions" that it disregarded. *Id.* at 564. And the complaint in *Iqbal* alleged that public officials had adopted a policy that discriminated against individuals based on their race and religion. 556 U.S. at 680–81. But again, the Court held that these allegations were "conclusory and not entitled to be assumed true." *Id.* at 681. The unadorned allegations that the lowest-fee shares were "readily available" or that the providers would have "waived" minimum investment requirements are equally conclusory.

What "well-pleaded facts" support these conclusions? *Id.* at 682. The complaint leaves out most details. Did Parker-Hannifin (like the administrators in *Forman*) select the expensive "retail" classes? 40 F.4th at 450. One might plausibly think such a large plan was "asleep at the wheel" if it chose shares that even a first-time investor could have obtained by buying a share or

two.  *Davis*, 960 F.3d at 483.  Or did Parker-Hannifin invest in much cheaper institutional classes, if not the cheapest class?  Under that scenario, the inference that Parker-Hannifin negligently missed this cost-saving possibility looks a lot less reasonable.  Apart from share classes, what minimum investment amounts did Northern Trust and Vanguard impose on investors to obtain the cheaper institutional-share classes?  And how close were the Plan's own investments to these qualifying amounts?  Did the Plan already "qualify" for the cheapest class or fall just a small amount short?  *Forman*, 40 F.4th at 453.  Or did the Plan need to invest tens of millions of dollars more to become eligible for the minimums?  Again, the first possibility would make it much more plausible that Parker-Hannifin committed acts of "mismanagement" than the second one.  *Davis*, 960 F.3d at 483.  If minimum amounts existed, did Vanguard and Northern Trust give any other retirement-plan "clients" waivers of those minimums?  *Forman*, 40 F.4th at 453.  Under what circumstances did they do so?  Solely because the plans were large?  Or did the clients have to give up something substantial in return?  The complaint says nothing about any of these facts.

At most, the complaint asserts two specific allegations to support its conclusion that the lowest-fee classes were "available" to Parker-Hannifin and that the fund "provider" would have "waived" any minimum investment amounts.  Compl., R.20, PageID 572.  It first cites a district court's decision in another case for the proposition that mutual funds often waive the investment minimums for institutional-share classes if large plans seek the waivers.  *See id.*, PageID 572–73 (citing *Tibble v. Edison Int'l*, 2010 WL 2757153, at *9 (C.D. Cal. July 8, 2010)).  This unusual factual allegation—tied to the facts in another opinion—does not change things.  As the district court explained, *Tibble* concerned waivers to avoid the highest-fee retail-share class—not waivers to move in between institutional-share classes.  *See Johnson*, 2023 WL 8374525, at *11.  And for all we know from the complaint, Parker-Hannifin obtained less-expensive (if not the least-expensive) institutional shares.  *Tibble* also involved different mutual funds—not funds issued by Northern Trust or Vanguard.  *Tibble*, 2010 WL 2757153, at *21, *29–30.  It says little about Vanguard's practices and even less about the Focus Funds, which were "collective investment trusts" rather than mutual funds.  Compl., R.20, PageID 555–56.

The complaint next cites a Vanguard document from the SEC's website. *Id.*, PageID 573 & n.21. This document says that Vanguard "reserves the right to establish higher or lower minimum amounts for certain investors." *Id.*, PageID 573; Vanguard Plans, R.47-5, PageID 1367–69. If anything, this sentence contradicts the complaint's earlier conclusion that the cheapest share classes were "readily available" to Parker-Hannifin. The document instead suggests that Vanguard *did* impose minimum requirements to obtain them. And something is not "readily" available if one must negotiate to obtain it. Regardless, the document offers no details about when Vanguard might waive these requirements. It includes one waiver example (when a plan is "expected to quickly achieve eligibility levels") that does not suggest any broad waiver practice. Vanguard Plans, R.47-5, PageID 1370. And it is not obvious why a fund provider would waive an income stream simply because a large plan has large amounts of money invested *elsewhere*. In my mind, these two specific allegations (about a different case and a Vanguard document) do not "plausibly" suggest that Parker-Hannifin negligently overlooked an opportunity to obtain shares with cheaper fees so as to state an imprudence claim. *Twombly*, 550 U.S. at 557.

Indeed, the complaint's reliance on the Vanguard document leaves me wondering why it did not say more. According to Parker-Hannifin, Johnson had plenty of public information available to answer some of the questions that I have asked. Appellees' Br. 13–15. The same document suggests that Vanguard requires $5 million in investments to get the (cheaper) institutional-share fees that the Plan received but much more—$100 million in investments—to get the (even cheaper) institutional-share-plus fees that Johnson says the Plan should have obtained. Vanguard Plans, R.47-5, PageID 1352–53, 1368–69. Parker-Hannifin adds that the Plan includes a fourth Vanguard Fund in the institutional-share-*plus* class because it has over $100 million investments. Appellees' Br. 14 (citing Notice, R.47-2, PageID 1278). And once one of the three challenged Vanguard funds reached that investment amount, the Plan started offering this cheapest class for it too. *Id.* at 15 (citing Notice, R.47-3, PageID 1294). Parker-Hannifin adds that these public materials are fair game at this stage. *See CommonSpirit*, 37 F.4th at 1168–69; *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007); *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1298 n.7 (11th Cir. 2019) (en banc).

I see no need to decide whether we can consider the materials. I would instead hold that the complaint's many omissions have left open an "obvious alternative explanation" that would reveal no negligence—Parker-Hannifin negotiated for the best fees that its investments permitted. *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567). In authorizing this claim, by contrast, my colleagues open the door to "speculative" ERISA suits. *Twombly*, 550 U.S. at 555. Plan administrators in this circuit should be warned: if their plans are big enough and if they have not obtained the least-expensive shares, they should prepare for "expensive" discovery no matter the reasons for selecting the share classes that they did. *Id.* at 558; *see Johnson*, 2023 WL 8374525, at *12. That outcome upends Congress's "careful" equilibrium between protecting beneficiaries and minimizing litigation costs. *Dudenhoeffer*, 573 U.S. at 424–25 (citation omitted).

For these reasons, I respectfully dissent.